**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------X

VANESSA WEISS,                                    Civil Action No.: 21-cv-4648

                                    **Plaintiff,**                    **COMPLAINT**

        -against-                                  *Jury Trial Demanded*

**PREMIER TECHNOLOGIES and**
**AT&T CORPORATION,**

                                    **Defendants.**
-----------------------------------------------------------------------X

 **PLAINTIFF VANESSA WEISS**, by her attorney Goddard Law PLLC, whose offices are

located at 39 Broadway, Suite 1540, New York, NY 10006, alleges upon knowledge with respect

to herself, and upon information and belief as to all other matters, as follows:

## PRELIMINARY STATEMENT

 1. This is a civil action brought on behalf of Plaintiff Vanessa Weiss (hereinafter

"Plaintiff") against Premier Technologies and AT&T Corporation (hereinafter "Defendants"), for

gender and sexual orientation discrimination in violation of Title VII, the New York Executive

Law, and the New York City Administrative Code together with any and all other causes of action

which can be reasonably inferred from the facts as set forth below.

## PARTIES

 2. Plaintiff is a citizen of the United States who currently resides, and at all times

relevant to this Complaint resided, in Rochester, New York.

 3. Plaintiff is and was, at all times relevant herein, an "individual" and "employee" of

Premier Technologies ("Defendant Premier Technologies") and AT&T ("Defendant AT&T")

(collectively known as "Defendants") within the meaning of all relevant federal, New York State

and local laws, including, but not limited to, Title VII of the Civil Rights Act, 42 U.S.C. §§2000e *et. seq.*

4.      Upon information and belief, at all times relevant to the Complaint, Defendant Premier Technologies was and is a domestic corporation incorporated under the laws of the State of New York. Upon information and belief, Defendant Premier Technologies' headquarters are located at 201 Fayette Street, Manilus, New York, 13104.  Plaintiff worked at Defendant Premier Technologies' Victor store located at 401 Commerce Drive, Suite 200, Victor, New York, 14564 and Defendant Premier Technologies' Batavia store at 4666 Veterans Memorial Parkway, Batavia, New York, 14020.

5.      Upon information and belief, at all times relevant to the Complaint, Defendant AT&T was and is a corporation registered in New York and permitted to do business in New York, and their headquarters are located at 28 Liberty Street, New York, New York, 10005.

6.      Upon information and belief, Defendant AT&T and Defendant Premier Technologies are joint employers.

7.      Defendants were, at all times relevant to the Complaint, Plaintiff's "employer" within the meaning of all relevant federal, New York State and local laws, including, but not limited to, Title VII.

**JURISDICTION, VENUE AND PROCEDURAL REQUIREMENTS**

8.      This is a civil action for monetary damages and such other relief as the Court deems just and proper based upon Defendants' discrimination of Plaintiff based on her gender and sexual orientation.

9.      This Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has supplemental jurisdiction over Plaintiff's state law claims

2

pursuant to 28 U.S.C. § 1367 because those claims are so related to the federal claims that they form a part of the same case or controversy between Plaintiff and Defendants.

10.     Venue for this action properly lies in this district pursuant to 28 U.S.C § 1391.

11.     This Complaint is brought pursuant to Article 15 of the New York Executive Law, specifically Exec. Law §§ 290 et seq., (the 'Executive Law"), which is known as the Human Rights Law, to redress discrimination with respect to terms and conditions or privileges of employment.

12.     This Complaint is additionally brought pursuant to the New York City Administrative Code §§ 8-101 et seq., (the "Administrative Code") to redress discrimination with respect to terms and conditions or privileges of employment.

13.     All precedent to filing the instant action have been fulfilled. On or about September 16, 2020, Plaintiff filed a timely Complaint of Discrimination with the Equal Employment Opportunity Commission ("EEOC") which was cross-filed with the New York State Division of Human Rights.  On or about February 24, 2021, the EEOC issued Plaintiff a Notice of Right to Sue.  This action is brought within 90 days of Plaintiff's receipt of her Right to Sue Notice.

14.     This Complaint is additionally brought pursuant to any other cause of action which can be inferred from the facts set forth herein.

15.     Plaintiff demands a jury trial.

## FACTUAL BACKGROUND

### Plaintiff Has Significant Experience With Defendants' Products, and is Hired by Defendants

16.     From 2014 to 2019, Plaintiff worked in customer service for the outsource call center at Sutherland Global, and Defendant AT&T was a client there. In this position, Plaintiff answered customer service calls for Defendant AT&T, in which she troubleshot with customers if

they had problems with Defendant AT&T products. As such, Plaintiff had significant experience with Defendant AT&T's products and services.

17.     Wanting to branch out into sales, and eager to make more money on commissions, Plaintiff applied for a job with Defendant Premier Technologies as a Sales Representative. Defendant Premier Technologies was an official retailer for Defendant AT&T products.

18.     In or about July 2019, Plaintiff had a phone interview with Defendant Premier Technologies' Human Resources Associate Mary Weiler ("HR Associate Weiler,") and then an in-person interview with Jeff Carpenter, Defendant Premier Technologies' Regional Manager ("Regional Manager Carpenter").

19.     Plaintiff dazzled her interviewers with her knowledge of Defendant AT&T's products, and she was hired to start at Defendants on July 27, 2019.

20.     Plaintiff was told she would work permanently at the Victor, New York store, but she was first assigned to the Batavia, New York store while the Victor store was getting prepared for a grand opening. Plaintiff was told that her supervisor in the Victor *and* Batavia stores would be Courtney ("Court") Sturdy ("Supervisor Sturdy"), and that he would be training her.

### Plaintiff Begins Work Under Supervisor Sturdy, Who Immediately Discriminates Against Her

21.     When Plaintiff arrived at the Batavia store, she began working with Supervisor Sturdy and Paul Draper ("Manager Draper"), who was the manager of the Batavia store. Soon after she commenced employment with Defendants, Supervisor Sturdy became acting manager at the Batavia store while Manager Draper was away.

22.     Plaintiff was very open about being a transgender woman with Manager Draper and Supervisor Sturdy.

4

23.     Plaintiff immediately saw that Supervisor Sturdy was extremely uncomfortable with her presence. He did not voluntarily talk to her, only talking to her when he absolutely had to, and utterly ignored her unless he was glaring at her as if she was bizarre. It was clear she was not welcome by Supervisor Sturdy because she was transgender.

24.     She was also shocked that at no point did he train her in any way for the job, even though he was her supervisor, and she had been explicitly told that he would be training her.

25.     Plaintiff wondered why her new supervisor, Supervisor Sturdy, with whom she would be working permanently, was not interested in getting to know her, train her, or find out what she knew and her strengths and weaknesses. Plaintiff tried to approach Supervisor Sturdy to ask questions, but he brushed her off or ignored her.

26.     Plaintiff's co-workers noticed the way Supervisor Sturdy treated her. They themselves were very friendly, and tried to show her the ropes as best they could.

27.     Upon information and belief, Supervisor Sturdy did not want to or intend to work with Plaintiff because she was transgender.  Still, Plaintiff felt confident that she could prove her value to Supervisor Sturdy if she worked hard enough.

28.     Plaintiff was so experienced with Defendant AT&T products that she was able to answer customer questions with knowledge and experience, which she thought would help her prove her value to Supervisor Sturdy.

29.     When Plaintiff started, she was not given her employee ID number for approximately five to six weeks. During this period, when she was making sales, these were not credited to her, because she did not have her employee ID number yet.

**Supervisor Sturdy Gives Crucial Sales Information to the Male Employees,
and Excludes Plaintiff**

30.     In or about August 2019, Plaintiff was sitting at the front of the store when she saw that the printer printed out a number of pages. Supervisor Sturdy came to the printer, grabbed the papers, and started to walk away. Because Supervisor Sturdy outright refused to train her in any way and she was worried he was not teaching her everything about the company, Plaintiff politely asked Supervisor Sturdy what the papers were.  Supervisor Sturdy just dismissed her with the wave of a hand and said it was "just something" he was "going over" with "the guys."

31.     Plaintiff was surprised by Supervisor Sturdy's dismissal of her, and his explicit statement that he was excluding her in favor of the male employees.

32.     When Supervisor Sturdy left the store that afternoon, Plaintiff asked her co-workers what the meeting had been about, and they answered that it was about new promotions and products that were being offered by Defendants. Plaintiff looked back to all of the times that Supervisor Sturdy and her male co-workers stood and talked together, took breaks together, and had lunch together, excluding her, and realized that Supervisor Sturdy had been informing the male employees of products and promotions without her.

33.     Upon information and belief, Supervisor Sturdy had previously excluded Plaintiff from crucial sales and product information in favor of her male colleagues because she is a transgender woman.

34.     Being informed of the latest promotions and products is one of the key ways in which sales representative obtain their sales numbers at Defendants' stores and gain commissions on their sales. As such, Supervisor Sturdy was preventing Plaintiff from generating sales by not providing her with the most up to date information, even though they hired her as a Sales Representative. Upon information and belief, Supervisor Sturdy was uncomfortable and

6

disparaging of Plaintiff as a transgender woman, and did not believe that she should represent Defendants or advance within the company like the men simply because she was a transgender woman.

**Plaintiff Reports the Discrimination to Human Resources,**
**Who Bizarrely Refuse to Talk on Defendants' Official Inter-Office Messenger**

35.     On or about that same day, in or about August 2019, Plaintiff decided to make a report of discrimination to Human Resources.

36.     Plaintiff used the inter-office messenger chat, and wrote to HR Associate Weiler. She told HR Associate Weiler exactly what had happened: that she saw Supervisor Sturdy collect papers from the printer, and when she asked about them he brushed her off and said he was just showing them to the guys, and that her male colleagues had told her that he was showing them new products and promotions. She also told HR Associate Weiler that Supervisor Sturdy never engaged with her or spoke to her unless he had to. She said that she would think that someone who was going to work with her at another of Defendants' locations would want to get to know her strengths and weaknesses, so that they could complement each other. Plaintiff then told HR Associate Weiler that she believed this was transgender discrimination.

37.     HR Associate Weiler paused, and after some silence, bizarrely said, "I don't know who is monitoring this chat," and told her that she would call her on her personal phone the next day to talk about this. Wary of leaving Defendants' official channels in favor of a personal phone call, Plaintiff had no choice and they signed off the chat.

38.     Upon information and belief, HR Associate Weiler refused to continue with Plaintiff's report of discrimination on the inter-office messaging system because she did not want to leave a paper trail that would open Defendants up to liability for discrimination.

39.     Also, upon information and belief, HR Associate Weiler swept Plaintiff's report of discrimination under the rug by not continuing the inter-office messaging, so that Defendants could fully control the narrative or pretend that the report of discrimination did not exist.

### Human Resources Forces Plaintiff
### Off Defendants' Official Channels to Report Discrimination

40.     The next day, HR Associate Weiler called Plaintiff on her personal phone, and asked how she was feeling. Plaintiff answered that she was frustrated. When HR Associate Weiler insultingly asked Plaintiff *again* to explain what had occurred, she told her that Supervisor Sturdy had printed something out, told her that she was just going over this with "the guys," that her male co-workers later told her that it was about new products and promotions. She told her that Supervisor Sturdy ignored her and didn't talk to her, and that she believed that it was transgender discrimination.

41.     HR Associate Weiler told Plaintiff that what had happened was "not very nice," and that she would ask Regional Manager Carpenter to speak to Supervisor Sturdy "about this." She said she was "sorry" it had happened and believed it could be "resolved."

42.     Plaintiff also stated: "If there is another store I can transfer to, I would love to transfer to that store, if there is an opportunity to do that." HR Associate Weiler said that she would "keep that in mind."

43.     Plaintiff was extremely anxious that Supervisor Sturdy would be informed of her discrimination report against him, but she was confident in believing that she did the right thing by reporting the discrimination she faced.

44.     Three days later she received a message from HR Associate Weiler which said that she had talked to Regional Manager Carpenter, who had spoken to Court [Supervisor Sturdy, and everything should be "ok." Plaintiff responded: "Ok."

8

**In a Car Ride Alone with Plaintiff, Supervisor Sturdy Refuses To Cease
Discriminating Against Plaintiff**

45.     Thereafter, Supervisor Sturdy continued to ignore and avoid Plaintiff. It was clear that Supervisor Sturdy refused to accept Plaintiff's gender as female.

46.     In or about late August 2019, Manager Draper told Supervisor Sturdy to train Plaintiff on doing community outreach. Supervisor Sturdy looked at Manager Draper and then looked at Plaintiff with a derisive look on his face as if to say "Really? I have to go with her?"

47.     Community outreach involved driving to businesses and personal addresses in the surrounding community to drop off information about Defendants' products and promotions, and speak to potential customers. Supervisor Sturdy looked annoyed and angry, but reluctantly agreed, and told Plaintiff she should drive, while he was in the passenger seat.

48.     Supervisor Sturdy was extremely uncomfortable while riding in a car with Plaintiff, and he barely spoke to her. He rushed through their visits to local businesses as if he could not wait to not be in Plaintiff's presence. He also offered no training to Plaintiff.

49.     On the way back to the office after doing community outreach, Supervisor Sturdy bitterly stated that "someone" in the store had "complained" about him, but that "whatever," he would just "deal." Supervisor Sturdy looked at Plaintiff angrily, making Plaintiff very uncomfortable.  In that moment, Plaintiff realized that Supervisor Sturdy was enraged with her for having reported him.

50.     Fearing for her safety because she was driving in an enclosed car, in a rural area, with a supervisor who was hostile to her as a transgender woman, and that she could not walk away if he became even more angry, Plaintiff nervously changed the subject, and they spoke about business matters.

51. Plaintiff was extremely relieved when the car ride was over, and left the car ride feeling emotionally drained and upset by the fact that even though she had reported transgender discrimination to Defendants, Supervisor Sturdy was obviously angry about her report, and in saying "Whatever," communicated that he would do nothing about her report of discrimination against him.

52. Upon information and belief, Supervisor Sturdy gravely resented Plaintiff's efforts to work in a harassment free environment and was angry that she had reported him for discriminating against her.

**Plaintiff Works Tirelessly to Generate Business at a New Store
That Had Little Customer Traffic**

53. On or about September 10, 2019, Plaintiff was finally moved to what was to be her permanent store, in Victor, New York. Her two co-workers at the location were Sales Representative Eddie (Last Name Unknown) ("Co-worker Eddie") and Sales Representative AJ (Last Name Unknown) ("Co-worker AJ"). Co-worker Eddie had seven years of experience working in a Defendant-affiliated store, and Co-worker AJ had seven to nine years of experience with a Defendant corporate store, unlike Plaintiff, who had never worked in a Defendant store. Co-worker Eddie and Co-worker AJ had already established relationships with clients who would return to buy products from them, or refer others to them, unlike Plaintiff.

54. Supervisor Sturdy also moved to this location and continued to supervise Plaintiff. This was a brand new store for Defendants, there was very little customer traffic and so business was slow for everyone at the store.

55. Nevertheless, as the weeks went on, Plaintiff's sales numbers became better and better, perfectly in line with a new employee's rates of sales. In fact, she had a lower rate of customer returns as well.

56.     Plaintiff immediately worked tirelessly to drum up business for Defendants, and to gain commissions for herself. She printed out and created folders in order to do community outreach, and made more than a hundred cold calls to businesses asking for their business, much more than her co-workers. Supervisor Sturdy belittled her while she was making the calls, saying sarcastically that they were "useless" and a "waste of time." However, Plaintiff was happy with the connections she made with the community, and knew that these connections would pay off in the future.

**Supervisor Sturdy Denies Plaintiff**
**the Opportunity to Gain Valuable Commissions**

57.     Plaintiff immediately took a three-part training in order to learn how to sell what Defendants called "First Net" accounts, which are exclusive accounts for first responders such as fire fighters, doctors, EMTs and ambulance workers. For each "First Net" account that Plaintiff sold, she would receive a significant commission, far more than selling any other type of account.

58.     When she finished the training, Plaintiff began to call first responder stations, introducing herself, and describing "First Net" accounts, and how they could further the first responders' work.

59.     Plaintiff was excited about the response from her calls, and told Supervisor Sturdy this. Supervisor Sturdy immediately and furiously shut her down, saying that she "could not" try to sell First Net accounts, that she didn't know what she was talking about, and that she could not possibly answer questions about the accounts, and he ordered her to stop making the phone calls.

60.     Plaintiff was confused because, upon information and belief, it was Defendants' policy that once a sales representative finished the training, they could start to sell First Net accounts.

61.     She calmly explained to Supervisor Sturdy that she was certainly educated enough from the training to sell the accounts, and if she did not know an answer to a client's questions she could look up the answer, or refer them to a manager, who could answer their question. Supervisor Sturdy yelled at Plaintiff that she was absolutely not allowed to sell these accounts, end of story.

62.     Upon information and belief, male and non-transgender employees of Defendants, including her co-workers at the Victor store, were permitted to sell First Net accounts after undergoing the three-part training.

63.     Upon information and belief, Supervisor Sturdy did not believe that Plaintiff, as a transgender woman, should be a sales representative for Defendants, and was setting her up for constructive termination.

## Supervisor Sturdy is Hostile and Belittling to Plaintiff

64.     Following her complaint of transgender discrimination, Supervisor Sturdy intensely micromanaged Plaintiff's sales each time they worked together and even interrupted her when she was helping customers.

65.     While she was with customers he interrupted her, stood in between her and the customers, did not allow her to speak, spoke belittling of her suggestions, disparaged her in front of the customers, and told customers that Plaintiff "Did not know what she was talking about." Supervisor Sturdy did not do this to Plaintiff's male colleagues.

66.     Upon information and belief, Supervisor Sturdy was mistreating Plaintiff in an effort to constructively terminate her.

67.     Plaintiff was aghast at the angry and vicious way that Supervisor Sturdy was treating her in front of customers.

68.     Most times, the customer left without the sale because of Supervisor Sturdy's belittling behavior, and at the detriment to Plaintiff making the sale, and the commission.  When these customers left, Plaintiff told Supervisor Sturdy calmly that he should let her make the sale and not interrupt, and reminded Supervisor Sturdy of her extensive experience with Defendants' products.

69.     When she did so, Supervisor Sturdy continued to abjectly insult her, yelling that she was "wrong, wrong, wrong," and that "she did not know what she was doing," and that she was "never going to make it" in the business. Supervisor Sturdy did not do this to Plaintiff's male colleagues.

70.     Plaintiff's co-workers could clearly see the discrimination that Plaintiff faced, with Co-worker AJ even saying to her: "Boy, he really has it out for you."

71.     Upon information and belief, Supervisor Sturdy did not believe that Plaintiff, as a transgender woman, should be working at Defendants, and tried to make her life miserable so she would quit.

**Plaintiff Asks Regional Manager Carpenter for a Transfer**

72.     Plaintiff was desperate to get away from the discrimination she faced at the hands of Supervisor Sturdy. The next time that Regional Manager Carpenter was in the store, she walked directly to him and said that if he had another store for her to transfer to, she would like to be considered for the transfer. Regional Manager Carpenter simply responded "Ok" and walked away.

73.     Upon information and belief, Regional Manager Carpenter, who spoke to Supervisor Sturdy about Plaintiff's report of discrimination, knew that Plaintiff was asking for a

transfer because of the discriminatory treatment from Supervisor Sturdy, but failed to act appropriately in stopping the discrimination by transferring Plaintiff.

**A Defendant Customer Tells Plaintiff She Will Not Return Because of the Discriminatory Hostility Plaintiff Experienced from Supervisor Sturdy**

74.    In or about mid-October 2019, a customer entered the store to inquire about a smart watch, and Plaintiff began to talk politely and informatively to the customer about Defendants' products and promotions.

75.    As he always did with Plaintiff, Supervisor Sturdy immediately crowded Plaintiff and interrupted her rudely, overtaking the sale, and speaking loudly and forcefully to the customer. He stood in between Plaintiff and the customer, and utterly ignored her.

76.    The customer looked at Plaintiff and excused herself and left the store, saying that she would "think about it."

77.    Two minutes later, the customer called the store from her cell phone, asking for Plaintiff. She told Plaintiff that she had been a wonderful salesperson, but that the customer could not believe the rude and belittling way Supervisor Sturdy had treated Plaintiff. She apologized and told her that she would not be returning to the store, simply because of Supervisor Sturdy's treatment of Plaintiff.

78.    Plaintiff graciously thanked the customer for the compliment and said that she hoped the customer would change her mind about the store and come back so that she could help her find what she needed. Plaintiff was embarrassed and humiliated that even customers could see the hostility and discrimination she faced every day at the hands of Supervisor Sturdy.

**Supervisor Sturdy Admits to Racially Profiling a Customer**

79.     In or about November 2019, Supervisor Sturdy admitted to her and to Co-worker Eddie that he had racially profiled a customer at a former job, at which he had worked with Co-worker Eddie.

80.     Plaintiff heard Supervisor Sturdy jokingly ask Co-worker Eddie whether he "remembered the time" when they worked at Prime Communications when "a black guy" came in to get the "latest greatest" iPhone. Supervisor Sturdy said he saw that his license was from the West Side of the state and refused to sell him a phone because anyone who had driven 35 miles to get a new phone was "suspicious."

81.     Supervisor Sturdy laughed and told them that the African-American customer had been on the local Rochester news complaining of racial profiling at the store, and he shook his head in disbelief that the customer had dared to accuse him of racial profiling.

82.     Plaintiff was absolutely shocked that Supervisor Sturdy would openly admit to racially profiling an African-American customer, but she stayed silent because she did not want to be screamed at or challenged by Supervisor Sturdy, as she always was.

83.     Upon information and belief, Supervisor Sturdy also racially profiled African-American customers at Defendants while employed at Defendants.

**Supervisor Sturdy Refuses to Schedule Plaintiff for Black Friday,
The Biggest Shopping Day of the Year**

84.     In or about late November 2019, Plaintiff was shocked to discover that she was not on the schedule for Black Friday, which was the biggest shopping day of the year, and, upon information and belief, the one in which a sales representative would make more commissions than any other day of the year, though Supervisor Sturdy and her male colleague (the other male colleague was on parental leave) were scheduled to work.

85.    Plaintiff approached Supervisor Sturdy and asked why she was not on the schedule for the biggest shopping day of the year, he angrily waved her off and said that he "didn't think it would be that busy."

86.    When Plaintiff returned after Black Friday, she looked at the sales numbers and saw that Supervisor Sturdy and Co-worker Eddie had made three times the amount of sales than they made on a typical day in the store, and it was an extremely busy day in the store.

87.    Upon information and belief, Supervisor Sturdy repeatedly sabotaged Plaintiff's work in order to force her to quit, or get her terminated once and for all.

## Plaintiff is Terminated Under False Pretenses

88.    On or about December 10, 2019, Plaintiff walked into work and saw Robyn Cortese, Vice President of Defendant Premier Technologies and Head of Human Resources ("VP Cortese") in the back of the store. VP Cortese asked Plaintiff into the back room, and made small talk with her. VP Cortese said that she heard Plaintiff had done hair and makeup professionally, and that this must have been "exciting," and Plaintiff responded that it was.

89.    Suddenly, Supervisor Sturdy came into the back room and sat down, and VP Cortese told her that she was being "let go." VP Cortese then shockingly said that perhaps customer service in tech products was "not the best road for [her] to pursue," and maybe Plaintiff wanted to stick to "hair and makeup" as a career. Shockingly, she told Plaintiff that she had a "friend" at the department store Lord & Taylor, and she could pass on her resume for a counter job doing make up there. She said "goodbye and good luck" and indicated that the conversation was over.

90.    Upon information and belief, VP Cortese, Supervisor Sturdy, and other employees at Defendants did not believe that a transgender woman should be a sales representative for their products because of discriminatory ideas about her gender. Also, upon information and belief, VP

16

Cortese believed that a transgender person was only suited for work with hair and makeup, based on discriminatory and outdated ideas about transgender women.

91.     Upon information and belief, Supervisor Sturdy ensured that Plaintiff would be terminated in retaliation for her report against him for transgender discrimination.

## AS AND FOR THE FIRST CAUSE OF ACTION
### (Gender and Sexual Orientation Discrimination in Violation of Title VII)

92.     Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

93.     Defendants have discriminated against Plaintiff in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et seq.,* as amended by the Civil Rights Act of 1991 ("Title VII"), by subjecting her to different treatment on the basis of her gender and her sexual orientation and/or perceived sexual orientation. Plaintiff has suffered both disparate impact and disparate treatment as a result of Defendants' wrongful conduct.

94.     Defendants have discriminated against Plaintiff by treating her differently from and less preferably than similarly-situated male, and/or heterosexual employees and by subjecting her to discriminatory pay, discriminatory denial of promotions, discriminatory performance evaluations, disparate terms and conditions of employment, and other forms of discrimination on the basis of her sex and sexual orientation in violation of Title VII.

95.     Defendants conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

96.     By reason of Defendants' discrimination, Plaintiff is entitled to all remedies available for violations of Title VII including an award of punitive damages. In addition, attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

## AS AND FOR THE SECOND CAUSE OF ACTION
**(Gender and Sexual Orientation Discrimination in Violation the New York Executive Law)**

97.     Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

98.     Defendants have discriminated against Plaintiff in violation of Section 296, subdivision 1(a) of the New York Executive Law, by subjecting her to different treatment on the basis of her gender and her sexual orientation and/or perceived sexual orientation.

99.     Defendants have discriminated against Plaintiff by treating her differently from and less preferably than similarly-situated male and/or heterosexual employees and by subjecting her to discriminatory pay, discriminatory denial of promotions, discriminatory performance evaluations, disparate terms and conditions of employment, and other forms of discrimination, in violation of New York Executive Law.

100.     As result of Defendants' conduct alleged in this complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, lost future employment opportunities, other financial loss, and non-economic damages.

101.     By reason of Defendants' discrimination, Plaintiff is entitled to all remedies available for violations of the New York Executive Law.

## AS AND FOR THE THIRD CAUSE OF ACTION
**(Gender and Sexual Orientation Discrimination in Violation the New York City Administrative Code)**

102.     Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

103.     Defendants have discriminated against Plaintiff in violation of Section 8-107, subdivision 1(a) of the New York City Administrative Code, by subjecting her to different treatment on the basis of her gender and her sexual orientation and/or perceived sexual orientation.

104.     Defendants have discriminated against Plaintiff by treating her differently from and less preferably than similarly-situated male and/or heterosexual employees and by subjecting her to discriminatory pay, discriminatory denial of promotions, discriminatory performance evaluations, disparate terms and conditions of employment, and other forms of discrimination, in violation of New York City Administrative Code.

105.     As a result of Defendants' conduct alleged in this complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, lost future employment opportunities, other financial loss, and non-economic damages.

106.     By reason of Defendants' discrimination, Plaintiff is entitled to all remedies available for violations of the New York City Administrative Code, including an award of punitive damages.

### AS AND FOR THE FOURTH CAUSE OF ACTION
**(Retaliation in Violation of Title VII)**

107.     Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

108.  Plaintiff repeatedly voiced concerns to Defendants about Defendants' discriminatory treatment of her.

109.  In retaliation, Defendants subjected Plaintiff to a series of adverse employment actions including, but not limited to, subjecting Plaintiff to a hostile work environment, disparate treatment, retaliatory poor evaluations, and a termination of Plaintiff's employment.

110.  Defendants' conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff, entitling her to punitive damages.

111.  As a result of Defendants' conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, other financial

loss, and non-economic damages.

112.   By reason of Defendants' retaliation, Plaintiff is entitled to all remedies available for violations of Title VII, including an award of punitive damages. Attorney's fees should be awarded under 42 U.S.C. § 2000e-5(k).

### AS AND FOR THE FIFTH CAUSE OF ACTION
**(Retaliation in Violation of New York Executive Law)**

113.   Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

114.   Plaintiff repeatedly voiced concerns to Defendants about Defendants' discriminatory treatment of her.

115.   In retaliation, Defendants subjected Plaintiff to a series of adverse employment actions including, but not limited to, subjecting Plaintiff to a hostile work environment, disparate treatment, retaliatory poor evaluations, and a termination of Plaintiff's employment.

116.   Defendants' conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff, entitling her to punitive damages.

117.   As a result of Defendants' conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, other financial loss, and non-economic damages.

118.   By reason of Defendants' retaliation, Plaintiff is entitled to all remedies available for violations of New York Executive Law. Attorney's fees should be awarded under the New York Executive Law.

### AS AND FOR THE SIXTH CAUSE OF ACTION
**(Retaliation in Violation of New York City Administrative Code)**

119.   Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

120.    Plaintiff repeatedly voiced concerns to Defendants about Defendants' discrimination.

121.    In retaliation, Defendants subjected Plaintiff to a series of adverse employment actions including, but not limited to, subjecting Plaintiff to a hostile work environment, disparate treatment, retaliatory poor evaluations, and a termination of Plaintiff's employment.

122.    Defendants' conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff, entitling her to punitive damages.

123.    As a result of Defendants' conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, other financial loss, and non-economic damages.

124.    By reason of Defendants' retaliation, Plaintiff is entitled to all remedies available for violations of New York City Administrative Code, including an award of punitive damages. Attorney's fees should be awarded under the New York City Administrative Code.

## **PRAYER FOR RELIEF**

**WHEREFORE,** for the foregoing reasons, it is specifically requested that this Court grant Plaintiff judgment as follows:

i.      On the First Cause of Action, awarding Plaintiff compensatory and other damages, including punitive damages in an amount to be determined at trial but in any case, no less than $1,500,000.00.

ii.      On the Second Cause of Action, awarding Plaintiff compensatory damages and other damages in an amount to be determined at trial but in any case, no less than $1,500,000.00.

iii.    On the Third Cause of Action, awarding Plaintiff compensatory and punitive damages and other damages in an amount to be determined at trial but in any case, no less than $1,500,000.00.

iv.    On the Fourth Cause of Action, awarding Plaintiff compensatory and other damages in an amount to be determined at trial but in any case no less than $2,500,000;

(v)    On the Fifth Cause of Action, awarding Plaintiff compensatory and other damages in an amount to be determined at trial but in any case no less than $2,500,000;

(vi)    On the Sixth Cause of Action, awarding Plaintiff compensatory and other damages in an amount to be determined at trial but in any case no less than $2,500,000; and

Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees, together with such other and further relief as this court deems equitable, proper, and just.

Dated: New York, New York
         May 24, 2021

Respectfully submitted,

GODDARD LAW PLLC

*Attorney for Plaintiff*

By: */s/ Megan S. Goddard*
        Megan Goddard, Esq.
39 Broadway, Suite 1540
New York, NY 10006
Tel: (646) 504-8363
Fax: 212-473-8705
Megan@goddardlawnyc.com

22